IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

BROOKE KEETON,

     Plaintiff,

v.                                       Civil Action No. 3:24-cv-321

JAMES ROANE DUDLEY, M.D.,
et al.,

     Defendants.

## MEMORANDUM OPINION

This matter is before the Court on DEFENDANTS' PARTIAL MOTION TO DISMISS FIRST AMENDED COMPLAINT (ECF No. 31) (the "MOTION"), MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' PARTIAL MOTION TO DISMISS FIRST AMENDED COMPLAINT (ECF No. 32), PLAINTIFFS' MEMORANDUM IN OPPOSITION TO THE MEDICAL DEFENDANTS' PARTIAL MOTION TO DISMISS (ECF No. 40), and REPLY IN SUPPORT OF DEFENDANTS' PARTIAL MOTION TO DISMISS FIRST AMENDED COMPLAINT (ECF No. 42), which seeks to dismiss COUNT II of the First Amended Complaint ("FAC") and the MOTION is said to be brought on behalf of five defendants; James R. Dudley, M.D., Louis Bermudez, Angela Epps, Brendan Farmer, and Savannah Shropshire who are referred to collectively as the "Medical Defendants." (ECF No. 31, p.1, and ECF No. 32, p.1). COUNT II of the FAC is directed, in its caption and the entirety of its substantive allegations, only against and

seeks relief only for Dr. Dudley (ECF No. 32, pp. 18-20 ¶ 98-104). Having reviewed the papers and for the reasons set forth below, the MOTION will be granted as to Dr. Dudley.

**BACKGROUND**

**I. Procedural History**

On May 8, 2024, Plaintiff Brooke Keeton ("Keeton") filed the COMPLAINT (ECF No. 1) seeking judgment against Defendants James Roane Dudley, M.D. ("Dr. Dudley"), Nurse Angela Epps ("Nurse Epps"), EMT Brendan Farmer ("EMT Farmer"), RMA Savannah Shropshire ("RMA Shropshire"), EMT Louis Bermudez ("EMT Bermudez"), Correctional Officer Sigifredo Luna ("Officer Luna"), Correctional Officer Gabriel Loesel ("Officer Loesel"), and Lieutenant Michael Yerby ("Lt. Yerby") (collectively, "Defendants") on two counts under Section 42 U.S.C. § 1983.

On June 27, 2024, the Defendants filed the DEFENDANTS' PARTIAL MOTION TO DISMISS (ECF No. 23). On July 11, 2024, The Plaintiff filed the FAC (ECF No. 29), which added allegations regarding Thompson v. McKenney, et al., Civil Action No. 3:17cv182 (E.D. Va.). In COUNT ONE, the FAC alleges a violation of the Fourteenth Amendment for the failure to receive constitutionally adequate medical care as a pretrial detainee. In COUNT II, the FAC alleges that Dr. Dudley is directly liable under a theory of

supervisory liability for the constitutional violations alleged to have been committed by the Defendants.

On July 15, 2024, the Court denied the DEFENDANTS' PARTIAL MOTION TO DISMISS (ECF No. 23) as moot. (ECF No. 30). The Defendants then filed the MOTION and have moved to dismiss COUNT II of the FAC, the alleged supervisory liability claim against Dr. Dudley.

## II. Factual Background

The facts alleged in the FAC (ECF No. 29), taken in the light most favorable to Keeton, consist of statements surrounding what medical screenings Keeton received during her admission to Northern Neck Regional Jail ("NNRJ"), her subsequent medical treatment (or lack thereof) while confined in NNRJ, her interactions with the medical staff and correctional officers of NNRJ, and the medical treatment that Keeton received after being sent to the hospital by Dr. Dudley.

### a. Keeton and the Northern Neck Regional Jail

On May 19, 2022, Keeton and her aunt, Amy Carter, were arrested and booked into Gloucester County Jail, Virginia. (ECF No. 29, ¶ 17). On May 20, 2022, Gloucester County Jail staff documented in an intake record that Keeton had "IV Track Marks" and used "Percocet IV." Id. Keeton had a documented history of intravenous ("IV") drug use. Id. ¶ 16. Keeton and Carter were transferred later that day from Gloucester County Jail to NNRJ,

and the Gloucester County intake form was allegedly transmitted to NNRJ at the same time. Id. ¶ 18.

Upon transfer, Keeton alleges that she became seriously ill due to a septic infection. Id. ¶ 19. Keeton and Carter alerted jail nurses and correctional officers that she required medical attention, but the officials advised Keeton that she needed to go through a formal medical request process. Id. ¶ 19. Keeton's request for the request forms went unanswered. Id. ¶ 19.

Later that day, Officer Luna, a correctional officer, performed Keeton's intake screening for NNRJ. Id. ¶ 20. He documented that Keeton was injured or bleeding and had difficulty moving. Id. Although Keeton advised Officer Luna that she had a history of IV drug use, Officer Luna recorded that Keeton had no history of drug or alcohol abuse. Id. ¶¶ 21, 25. That notice notwithstanding, Officer Luna did not perform a Clinical Opiate Withdrawal Scale ("COWS") assessment, which assesses risk of dangerous opiate withdrawal symptoms. Id. ¶¶ 23-24, 26. Moreover, Officer Luna concluded that Keeton did not require medical attention, even though he noted that Keeton was in "severe pain." Id. ¶ 23.

That evening, Keeton complained to EMT Farmer that she had "severe back pain." Id. ¶ 30. EMT Farmer did not conduct an evaluation of Keeton or consult Dr. Dudley. Id. Keeton also reported severe chest and back pain that evening to Nurse Epps.

4

Id. ¶¶ 32-33. Nurse Epps did not conduct a medical evaluation, take Keeton's vital signs, or notify Dr. Dudley of the situation. Id.

Keeton's condition worsened over the next few days, and she became unable to walk. Id. ¶¶ 36-37.  Other inmates began taking care of her basic needs, such as carrying her around and showering her. Id. Officer Luna allegedly observed Keeton and remarked: "That's why we don't do drugs." Id. ¶ 38.

On May 24, four days after admission to NNRJ, Keeton completed a medical request form, in which she wrote ""I have chest pains can't walk can't move[.]" Id. ¶¶ 39-40. Nurse Epps received the form and took no action. Id. ¶ 41. That same day, Officer Loesel issued a disciplinary offense against Keeton for "Failure to follow count procedure" as she could not stand up for count. Id. ¶ 42-44. Officer Loesel took no action to alert medical staff of her condition. Id. Keeton's condition worsened, as she was defecating herself and could no longer feed herself. Id. ¶ 45.

On May 25, Keeton submitted a request form asking NNRJ to retrieve her medical records. Id. ¶ 47. That day, five days after entering NNRJ, RMA Shropshire conducted a booking medical screening and noted Keeton's history of drug abuse and her chest pains. Id. ¶48. However, RMA Shropshire did not perform a COWS assessment before sending Keeton back to general population. Id. ¶¶ 49-50. The screening found no evidence of a skin infection. Id.

On May 28, EMT Burmedez responded to a medical assistance request from Keeton for severe chest pain. Id. ¶ 53. EMT Bermudez had Keeton brought to the medical unit and took her vital signs. Id. EMT Burmedez denied Keeton's request for pain medication for the stated reason that he was "unable to confirm if [Ms. Keeton] received anything during pm pill call." Id. ¶ 54. Consequently, EMT Burmedez sent Keeton back to general population without any medical treatment, follow up, or consulting with Dr. Dudley. Id. ¶¶ 54-55. Lt. Yerby issued two disciplinary charges against Keeton based on this event, including "Faking a Medical Emergency" and "Delay and Hinder." Id. ¶¶ 56-57.

On May 29, Keeton again was brought to the medical section at NNRJ after reporting she was not feeling well. Id. ¶ 61. Keeton reported to Nurse Allen that she used opiates, she was experiencing diarrhea, and she was hearing and seeing things. Id. Nurse Allen took Keeton's vital signs, which were elevated, then performed a COWS assessment of Keeton, which found she was experiencing mild opiate withdrawal, and then called Dr. Dudley, who ordered Keeton to be put on detox protocol for nine days. Id. ¶¶ 60-63.

On May 31, EMT Farmer responded to Keeton for complaints of back pain, but EMT Farmer's notes inexplicably recorded that Keeton "stated no complaints at that time" and that Keeton "was sitting up and acknowledged my presence." Id. ¶ 66. There is no indication EMT Farmer physically evaluated Keeton or took her vital signs.

Id. ¶ 66. But, shortly thereafter, EMT Farmer reported that "due to inmate complaining of back pain," he provided Keeton with medications, underwear, and a biohazard bag. Id. ¶ 67. Minutes after that, Keeton was taken from her cell to the medical section because she was "lethargic, diaphoretic, and tachypneic." Id. ¶ 68. Keeton saw Nurse Allen, who noted Keeton was "soiled in feces." Id. Nurse Allen took medical pictures, which revealed Keeton had developed a vicious decubitus ulcer. Id. Dr. Dudley examined Ms. Keeton and ordered she be sent to the hospital. Id. ¶ 69.

Keeton was transported to the hospital, where she was found to be in septic shock, and to have a Stage II decubitus ulcer caused by prolonged immobility. Id. ¶ 70. Two days later, Keeton was incapacitated and placed on life support. Id. ¶ 71. The ulcer developed into a Stage IV sacral decubitus wound, requiring multiple surgeries. Id. ¶ 72. She also eventually underwent a heart valve replacement surgery to treat her septic infection and endocarditis. Id. ¶ 73.

> b. The "Reese Incident"

The FAC also alleges that, in 2016, there was a similar incident at the NNRJ, and that, as a result of the incident the Estate of Jamie Kirkwood Reese brought wrongful death and § 1983 claims against NNRJ officials in March 2017. Id. ¶ 76 (citing Thompson v. McKenney, et al., Civil Action No. 3:17cv182 (E.D. Va.) (REP) ("Reese Complaint") (ECF No. 1)). In particular, the

Reese Complaint alleged that, when Reese entered NNRJ, she was recovering from opioid addiction, but was incarcerated at NNRJ for two days before receiving an initial "inmate screening" conducted by a correctional officer. Id. ¶¶ 77, 79-80 (citing Reese Compl. ¶ 20-21). Even though Reese informed a correctional officer that she was on medication, the correctional officer failed to document that in her record. Id. Reese later had a "medical assessment" performed, and again no medication history was recorded. Id. ¶ 80 (citing Reese Compl. ¶ 20). A nurse signed off on the assessment four days later, and Dr. Dudley signed off on the assessment on an unknown date. Id. ¶ 81 (citing Reese Compl. ¶ 22). On March 4, 2016, Reese suffered a stroke and later died at a hospital. Id. ¶ 83 (citing Reese Compl. ¶¶ 31, 62).

The allegations in the Reese case are similar to those made by Keeton. It is not alleged that Dr. Dudley was a defendant in the Reese case. Nor is it alleged that Dr. Dudley was made aware of the allegations in the Reese Complaint. However, it is reasonably inferable that Dr. Dudley was made aware of the Reese case because of his supervisory position.

### c. Dr. Dudley's Position

Dr. Dudley, around whom this motion revolves, is the Medical Authority for NNRJ. (ECF No. 29, ¶ 14). Dr. Dudley makes all final decisions with respect to the development and implementation of medical policies, protocols, and procedures. Id. Keeton alleges

that, pursuant to his contract, Dr. Dudley assumed certain responsibilities, including to: examine all inmates referred to him by nursing staff; coordinate emergency department visits; and review, write, authorize and/or implement medical policies, protocols, and procedures in effect at NNRJ. Id.

DISCUSSION

## I. Legal Standard

### a. Rule 12(b)(6)

"A motion filed under Rule 12(b)(6) challenges the legal sufficiency of a complaint, considered with the assumption that the facts alleged are true." Francis v. Giacomelli, 588 F.3d 186, 192 (4th Cir. 2009) (cleaned up). The Court "must accept the factual allegations of the complaint as true and construe them in the light most favorable to the nonmoving party." Rockville Cars, LLC v. City of Rockville, 891 F.3d 141, 145 (4th Cir. 2018). So, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). But, "[a]lthough for the purposes of [a] motion to dismiss [the Court] must take all the factual allegations in the complaint as true, [it is] not bound to accept as true a legal conclusion couched as a factual allegation." Papasan v. Allain,

9

478 U.S. 265, 286 (1986). Mere labels and conclusions declaring that the plaintiff is entitled to relief are not enough. Twombly, 550 U.S. at 555. Thus, "naked assertions of wrongdoing necessitate some factual enhancement within the complaint to cross the line between possibility and plausibility of entitlement to relief." Giacomelli, 588 F.3d at 193 (internal quotation marks omitted).

### b. Supervisory Liability

The "doctrine of respondeat superior has no applicability to § 1983 claims." Harbeck v. Smith, 814 F. Supp. 2d 608, 626 (E.D. Va. 2011) (citing Love-Lane v. Martin, 355 F.3d 766, 782 (4th Cir. 2004)). However, under certain circumstances, "supervisory officials may be held liable ... for the constitutional injuries inflicted by their subordinates." Shaw v. Stroud, 13 F.3d 791, 798 (4th Cir. 1994). This theory of liability is not based on respondeat superior, but on "a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care." Timpson v. Anderson Cnty. Disabilities & Special Needs Bd., 31 F.4th 238, 257 (4th Cir. 2022) (quoting Slakan v. Porter, 737 F.2d 368, 372 (4th Cir. 1984)).

The Fourth Circuit outlined what a plaintiff must show to succeed on a § 1983 claim for supervisory liability:

> (1) that the supervisor had <u>actual or constructive knowledge that h[er] subordinate was engaged in conduct that posed 'a pervasive and unreasonable risk' of constitutional injury</u> to citizens like the plaintiff;(2) that the supervisor's response to that knowledge was so inadequate as to show 'deliberate indifference to or tacit authorization of the alleged offensive practices,'; and (3) that there was an 'affirmative causal link' between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff.

<u>Timpson</u>, 31 F.4th at 258 (citing <u>Shaw v. Stroud</u>, 13 F.3d 791, 799 (4th Cir. 1994)(emphasis added)).

To satisfy the requirements of the first element, "a plaintiff must show the following: (1) the supervisor's knowledge of (2) conduct engaged in by a subordinate (3) where the conduct poses a pervasive and unreasonable risk of constitutional injury to the plaintiff." <u>Shaw</u>, 13 F.3d at 799 (citations omitted). "Establishing a 'pervasive' and 'unreasonable' risk of harm requires evidence that the conduct is widespread, or at least has been used on several different occasions and that the conduct engaged in by the subordinate poses an unreasonable risk of harm of constitutional injury." <u>Id.</u> (citations omitted).

The second element requires a plaintiff to show "deliberate indifference to or tacit authorization of the alleged offensive practices." <u>Baynard v. Malone</u>, 268 F.3d 228, 235 (4th Cir. 2001). A plaintiff "may establish deliberate indifference by demonstrating a supervisor's continued inaction in the face of documented widespread abuses." <u>Id.</u> The most cited case on the issue

11

of supervisory liability in the Fourth Circuit, <u>Shaw v. Stroud</u>, instructs that the "plaintiff assumes a heavy burden of proof in establishing deliberate indifference" because:

> <u>Ordinarily, [the plaintiff] cannot satisfy his burden of proof by pointing to a single incident or isolated incidents</u>, for a supervisor cannot be expected to promulgate rules and procedures covering every conceivable occurrence within the area of his responsibilities. Nor can he reasonably be expected to guard against the deliberate criminal acts of his properly trained employees when he has no basis upon which to anticipate the misconduct. A supervisor's continued inaction in the face of documented widespread abuses, however, provides an independent basis for finding he either was deliberately indifferent or acquiesced in the constitutionally offensive conduct of his subordinates.

<u>Shaw v. Stroud</u>, 13 F.3d 791, 799 (4th Cir. 1994) (quoting <u>Slakan v. Porter</u>, 737 F.2d 368, 273-73 (4th Cir. 1984))(emphasis added).

Finally, the third element is a requirement of causation. A plaintiff can prove causation by showing "an 'affirmative causal link' between the supervisor's inaction and the harm suffered by the plaintiff." <u>Shaw</u>, 13 F.3d at 799 (citation omitted). However, this element is not put at issue by the MOTION.

## II. ANALYSIS

The MOTION is grounded upon the theory that the FAC does not adequately plead that Dr. Dudley has actual or constructive knowledge of a pervasive and unreasonable risk of constitutional injury. At the heart of the MOTION is whether the two alleged incidents are sufficient, at this procedural posture, to meet the

"widespread or pervasive" test or to demonstrate supervisory deliberate indifference.

> ### a. First Element: Dr. Dudley's Knowledge of Pervasive and Unreasonable Risk of Constitutional Injury

The first element of the supervisory liability claim requires Keeton to make sufficient factual allegations that Dr. Dudley had knowledge, either actual or constructive, that there was a pervasive and unreasonable risk of constitutional injury at NNRJ. Shaw, 13 F.3d at 799 (citations omitted). To break this down, Keeton must plead facts making it plausible that a pervasive and unreasonable risk of constitutional injury of the sort that Keeton claims existed at NNRJ. Id. Next, Keeton must plausibly allege (with sufficient factual text) that Dr. Dudley had sufficient knowledge of such a risk. Id.

The FAC is not particularly clear about the nature of the pervasive and unreasonable risk that forms the basis of the supervisory liability claim. But, Keeton's brief opposing the MOTION makes clear that the theory on which COUNT II is based is that Keeton's constitutional injury occurred because:

> Dr. Dudley failed to implement a medically appropriate medical request procedures or screening mechanism for incoming detainees which in turn resulted in the failure of staff of NNRJ to timely screen Ms. Keeton for opioid withdrawal and treat her accordingly.

(ECF No. 40, p. 2).

13

### i.  Pervasive and Unreasonable Risk

Keeton argues that the Reese Complaint "provide[s] a plausible basis to conclude that the medical protocols, policies and procedures in effect in 2016 were the same (or similar) as those in effect in 2022—when Ms. Keeton experienced her injury." (ECF No. 40, p. 13). In other words, the alleged factual support for a pervasive and widespread risk is that there was "in 2016, a similar absence of appropriate medical intakes and screening resulted in the death of another inmate, Ms. Reese" and that "like Ms. Keeton, Ms. Reese received her initial intake by a correctional officer who failed to document basic medical information about the inmate." Id. ¶¶ 76-85, 101(f-g). The FAC also makes a conclusory statement that "Dr. Dudley implemented a constitutionally deficient policy and/or medical procedure at NNRJ of performing a cursory and woefully inadequate medical screening of incoming detainees that failed to properly assess their risk of withdrawal." (ECF No. 29, ¶ 52). But, that adds nothing to the plausibility of COUNT II because "a complaint must contain 'more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.'" Francis v. Giacomelli, 588 F.3d 186, 193 (4th Cir. 2009) (citation omitted).

In Timpson, the Fourth Circuit concluded that "establishing a pervasive and unreasonable risk of harm under the first element 'requires evidence that the conduct is widespread, or at least has

been used on several different occasions[.]'" <u>Timpson</u>, 31 F.4th at 257-258 (citation omitted).

Here, to establish a pervasive and widespread risk of harm, Keeton is relying on the Reese Complaint and her own circumstances as evidence that correctional officers were performing inadequate intake assessments. These two incidents are six years apart from each other and have no direct relationship. These two incidents are not conduct "of a quantity and quality sufficient to put [Dr. Dudley] on notice of the pervasive and unreasonable risk" of constitutional injury posed by his subordinates, and thus amount to isolated incidents insufficient to state a § 1983 claim against Dr. Dudley. <u>Addison v. Brinkman</u>, 2011 U.S. Dist. LEXIS 12359 (E.D. Va. Feb. 8, 2011) (holding that subordinate's actions of twice improperly conducting undercover operations are "far more akin to 'isolated incidents,' than they are to 'widespread' misconduct.") (internal citations omitted); <u>Boone v. Clarke</u>, 2022 U.S. Dist. LEXIS 147416 (E.D. Va. Aug. 17, 2022) ("the two incidents of improper needle disposal—which occurred six months apart—amount to isolated incidents that are insufficient to hold [defendants] liable under § 1983."); <u>Randall v. Prince George County</u>, 302 F.3d 188, 207 (4th Cir. 2002) ("courts have appropriately required proof of multiple instances of misconduct before permitting supervisory liability to attach.") (citation omitted).

ii.   **Actual or Constructive Knowledge**

To establish the supervisory liability claim, Keeton also must plausibly allege that Dr. Dudley had "actual or constructive knowledge" that his subordinates were engaged in conduct that posed "a pervasive and unreasonable risk" of constitutional injury. Shaw, 13 F.3d at 799. Because the Court has found there are not sufficient allegations to plausibly allege that there was pervasive and widespread risk of harm, this sub-element effectively collapses in on itself. But, because the two concepts are related, it is appropriate to address the issue.

First, Keeton has not sufficiently alleged that actual knowledge of any pervasive risk of harm exists. The analysis of Dr. Dudley's actual knowledge begins with the fact that Keeton has not alleged any direct contact with Dr. Dudley until May 31, 2022, when he examined her and sent her to the emergency room. (ECF No. 29, ¶ 69). The FAC's allegations respecting the care of Keeton, such as her inability to get medical request forms and the decisions of others on the medical staff respecting whether and how to provide medical care, do not provide a basis for actual knowledge either because those same allegations show that Dr. Dudley was not made aware of these events. Nor does the Reese Complaint provide a basis to find actual knowledge because it was a lawsuit that was resolved outside of the court, Dr. Dudley was not a named defendant in the case, and the FAC does not allege

16

that Dr. Dudley had any knowledge of the Reese Complaint. Id. ¶¶ 76-85. And, in fact, in her opposing brief Keeton has only presented arguments addressed to constructive knowledge. (ECF No. 40, pp. 11-15). Thus, Dr. Dudley's supervisory liability must depend on constructive knowledge.

Second, Keeton relies on the decision Woodson v. City of Richmond, 88 F. Supp. 3d 551 (E.D. Va. 2015) to show that constructive knowledge has been adequately alleged. Keeton equates Dr. Dudley to the supervisor defendant in Woodson, who was found to have sufficient constructive knowledge at the summary judgment stage based on his "high level of responsibility coupled with the violations alleged to have occurred on [his] watch." (ECF No. 40, p. 10) (quoting Woodson, 88 F. Supp. 3d at 573). Here, Keeton claims that the "unique factual dynamics" of Dr. Dudley's high level of responsibility equate to him possessing constructive knowledge. (ECF No. 40, p. 10). Keeton contends that Woodson stands for the proposition that Dr. Dudley has constructive notice because Dr. Dudley's "high level of responsibility" as the Medical Authority at NNRJ combined with the Reese Incident "provid[es] a plausible basis" to conclude that Dr. Dudley had constructive notice that correctional officers were performing inadequate intake assessments. Id. at 13.

However, the factual situation presented in the FAC is not on equal footing with Woodson. In Woodson, the court found that there

17

was evidence of subordinates not only twice failing to patrol as required, but also found there was additional testimony and evidence to support "a jury's reasonable inference that the deputies' practice of failing to conduct the required security checks twice per hour was widespread and flagrant." 88 F. Supp. 3d at 574.

Here, the FAC has pointed to two instances (Keetown's own and Reese) where correctional officers at NNRJ failed to document medication on intake. But Keeton has not further alleged that there were widespread and flagrant failures that could cause risk of constitutional injury, such as widespread failures to document medications during the intake process or widespread failures to perform COWS assessments on pre-trial detainees. Instead, Keeton has only alleged that there is an improper policy of allowing correctional officers to perform intake assessments based on these two incidents. (ECF No. 29, ¶ 52). These two incidents alone are insufficient to plausibly allege that Dr. Dudley possessed constructive knowledge of a pervasive and unreasonable risk of constitutional injury. See Wiggins v. Quesenberry, 222 F. Supp. 3d 490 (E.D. Va. 2016) (finding that insufficient knowledge was pled based on one incident, as "a supervisor must have knowledge that the 'conduct is widespread, or at least has been used on several different occasions.'")(quoting Randall, 302 F.3d at 206).

### b. Second Element: Dr. Dudley's Deliberate Indifference

The analysis to be performed for deliberate indifference is similar to the pervasive and widespread risk analysis performed above (supra, pp. 19-21), and Keeton's supervisory claim fails for the same reasons. To adequately allege that Dr. Dudley acted with deliberate indifference "under Shaw's second prong, a plaintiff '[o]rdinarily ... cannot satisfy his burden of proof by pointing to a single incident or isolated incidents[.]'" Moore v. Greenwood Sch. Dist. No. 52, 195 F. App'x 140, 144 (4th Cir. 2006)(citing Randall v. Prince George's County, 302 F.3d 188, 206 (4th Cir. 2002)). Based on the same line of reasoning used in the analysis on widespread and pervasive conduct (supra, pp. 19-21), the alleged conduct to which Dr. Dudley acted with deliberate indifference are isolated incidents and are not sufficient to state a supervisory liability claim. See, e.g, Carter v. Morris, 164 F.3d 215, 221 (4th Cir. 1999)(holding that the record was "devoid of evidence supporting" a claim of deliberate indifference where the plaintiff "offers only one prior incident similar to own of which [defendant] was or should have been aware").

19

**CONCLUSION**

For the reasons set forth above, the Court will GRANT the MOTION and dismiss Count II of the First Amended Complaint.

/s/

Robert E. Payne
Senior United States District Judge

Richmond, Virginia
Date: October 7, 2024